Charles D. Marshall (State Bar No. 236444)
**MARSHALL LAW FIRM**
2121 N. California Blvd., Suite 290
Walnut Creek, CA  94596
Telephone: (925) 575-7105
Facsimile: (855) 575-7105
cdm@marshall-law-firm.com

*Attorney for Plaintiff Joseph Daniluk, on behalf of*
*himself and all others similarly situated*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH DANILUK, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ROBINHOOD FINANCIAL, LLC, ROBINHOOD SECURITIES, LLC ROBINHOOD MARKETS, INC. CITADEL, LLC, d/b/a Citadel Securities, POINT72 ASSET MANAGEMENT, L.P.,<br><br>Defendants. | Case No. 21-cv-980<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff brings this putative class action, seeking redress on behalf of himself and others similarly situated, for Defendants' successful attempts to manipulate the prices of certain publicly-traded securities for the benefit of themselves and their co-conspirators, to the detriment of the putative class of retail investors, via deceptive and unfair conduct, numerous breaches of contractual, fiduciary, and other duties, and aiding and abetting the same.

**BACKGROUND**

1.      American capital markets, colloquially and collectively known as "Wall Street" after the location of some of the largest exchanges, have typically been perceived by the public as playgrounds for the elite. While a substantial portion of the capital moving through these markets is put up by small, individualized "retail investors," the ability to unilaterally cause or otherwise influence significant market movements has historically been limited to large, institutional investors, which are capable of commanding large concentrations of capital in ways that have been impracticable or impossible for retail investors, and in ways that often have profound, real impacts on the economic prospects of individuals (the colloquial "Main Street"). This inequality of access has predictably bred consumer resentment.

2.      Since its inception, Defendant Robinhood has sought to profit off of that resentment, positioning itself as a champion for Main Street, and ostensibly providing retail investors with online access to investment tools and trades that were previously unavailable to them. Robinhood marketed extensively toward this populist class of retail investor, using slogans such as "[w]e are all investors," and promising to "democratize the stock market." Even Robinhood's name is designed to evoke images of taking from the rich, to give to the poor.

3.      Robinhood's marketing strategy has plainly been intended to capitalize on a growing populist movement of retail investors becoming aware of the manner in which large, institutional investors use their outsized influence on the markets to engage in trading strategies that cause unanticipated volatility, for the purposes of enriching those institutional investors at the expense of retail investors who cannot engage in such market manipulation.

4.     Indeed, Robinhood stated in a 2014 blog post: "We believe the stock market is one of the best available tools for individual wealth creation. But too few have reaped the benefits of this powerful, economic force. And it's no wonder why."

5.     As Robinhood attempted to profit off of this populist movement, participants were self-organizing into their own grassroots communities, for the purposes of sharing knowledge about, and perhaps even countering, the unfair trading advantages of large, institutional investors.

6.     One such community developed on a social media message board on the online discussion forum Reddit.com, which called itself WallStreetBets. Participants in the WallStreetBets community took particular issue with the common Wall Street practice of "shorting" stocks—that is, borrowing shares of a stock at a particular price and selling them, with the intention of returning those shares to the lender later, after buying them back at a lower price and pocketing the difference. A "short position" is essentially a bet that a stock will decrease in price. This practice, in particular, drew the ire of WallStreetBets because it can have the effect of artificially depressing the price of the shorted stock, harming both the holders of the stock and the underlying business.

7.     When an institutional investor has a particularly large short position, it is vulnerable to a trading strategy known as a "short squeeze," wherein an effort is made to buy up as much of the shorted stock as possible while refusing to sell it. If enough buy orders are made, the price of the shorted stock will rise, forcing the shorting investor to buy back the borrowed shares at a price higher, instead of lower, than it sold them. An investor's potential losses when subjected to a short squeeze are theoretically unlimited. But historically, only investors controlling enough capital to influence the price of a shorted stock through their own trading

1    decisions were capable of successfully pulling off a short squeeze—that is, other large,

2    institutional investors.

3           8.     As something of a social experiment, certain WallStreetBets participants

4    wondered whether a short squeeze could, for the first time in history, be successfully executed by

5    retail investors—by Main Street—through collective parallel action via viral social media

6    messaging. To that end, a hedge fund was identified that was particularly vulnerable to a short

7    squeeze due to its excessively large short position on an otherwise nondescript stock for the

8    company Gamestop Corp. ("GME"). The fund in question was Melvin Capital Management

9    ("Melvin"), a fund having close relationships with, and staked by, Defendants Citadel, LLC and

10   Point72 Asset Management, L.P. Thereafter, numerous posts began appearing on Reddit.com

11   and other social media platforms exhorting retail investors to buy and hold GME for the

12   purposes of squeezing overexposed hedge funds.

13          9.     By all appearances, this experiment was a success. The social media posts in

14   question became a viral grassroots campaign, and the price of GME rose throughout the month

15   of January 2021. During the week of January 25, 2021, the price of GME exploded, doubling in

16   value multiple times over, as mainstream news agencies began to report on and thereby continue

17   to spread the viral exhortation to buy and hold.

18         10.    Spurred on by this initial success, retail investors went about identifying

19   additional stocks to squeeze, including but not limited to Nokia ("NOK"), American Airlines

20   ("AAL"), Blackberry (BB), and AMC Entertainment Holdings ("AMC"), each of which, along

21   with GME, was owned by Plaintiff during the relevant time period.

22         11.    The consequences to Melvin Capital's short position were extreme. The hedge

23   fund lost billions of dollars of value over the course of a few days. By January 27, 2021, this

1   outcome was being celebrated by the public as just desserts—a fitting punishment for Melvin's

2   irresponsibly large bet on GME's decline and the unnecessary instability that bet created in the

3   market, and a demonstration of both Main Street's resentment of the casino-style games that

4   Wall Street plays with America's wealth and of Main Street's newly-found ability to act in

5   parallel to combat those practices.

6       12.   On January 28, 2021, however, the mood of retail investors soured when they

7   discovered those investors making use of Robinhood's services – a substantial portion – found

8   themselves inexplicably prohibited from buying additional GME shares, as well as certain other

9   stocks targeted for Main Street short squeezes, as Robinhood encouraged them to sell those

10  stocks. This, of course, would have the ultimate effect of tanking the stock price (and saving

11  Melvin) by kneecapping demand, but not before depriving Robinhood clients of the opportunity

12  to earn more profits up until the stock price peaked. Wall Street's apparent response to the

13  successful GME short squeeze was not a soul-searching self-examination of bad bets and

14  excessive risk, but rather a malicious attempt to disrupt retail investors' successful investment

15  strategies while preventing Melvin from going bankrupt. When Wall Street lost, they simply

16  changed the rules.

17      13.   In beating back this populist rebellion against Wall Street's dominance of

18  American capital markets, Robinhood did more than abandon its numerous marketing

19  commitments to fight for and protect Main Street – it left its own clients in a position to suffer

20  unnecessary losses, and breach numerous duties to its clients in the process.

21                          **PARTIES**

22      14.   Plaintiff JOSEPH DANILUK ("Daniluk") is a natural person domiciled in

23  Chicago, Illinois. He is, therefore, a citizen of the State of Illinois.

15. During the relevant period, Plaintiff owned shares, and either attempted to or intended to buy additional shares, of the following stocks which were illegally restricted by Robinhood beginning during the week of January 25, 2021: GME, AMC, AAL, BB, and NOK.

16. Defendant ROBINHOOD MARKETS, INC. is a Delaware corporation with its principal place of business in Menlo Park, California. Robinhood Markets, Inc. is the corporate parent of and controls the affairs of Defendants Robinhood Financial, LLC and Robinhood Securities, LLC (collectively, with Robinhood Markets, Inc., "Robinhood")

17. Defendant ROBINHOOD FINANCIAL, LLC is a Delaware corporation with its principal place of business in Menlo Park, California, and is a wholly-owned subsidiary of Robinhood Markets, Inc. Robinhood Financial, LLC is registered as a broker-dealer with the U.S. Securities & Exchange Commission ("SEC"), and acts as an introducing broker for Robinhood Financial, LLC.

18. Defendant ROBINHOOD SECURITIES, LLC is a Delaware corporation with its principal place of business in Mary Lake, Florida, and is a wholly-owned subsidiary of Robinhood Markets, LLC. Robinhood Securities, LLC is registered as a broker-dealer with the U.S. Securities & Exchange Commission ("SEC"), and acts to clear trades introduced by Robinhood Financial, LLC.

19. Defendant CITADEL, LLC, is an Illinois limited liability company with its principal place of business in Illinois.

20. Defendant POINT72 ASSET MANAGEMENT, L.P. is a partnership with its principal place of business in Connecticut.

1    21.    Both Citadel and Point72 have invested significant amounts of money in Melvin,

2    and simultaneously are responsible for a significant amount of Robinhood's revenue, via fees

3    paid in connection with their fulfilling of orders placed by Robinhood's clients, and as such,

4    exercise a significant amount of *de facto* control over Robinhood.

5                              **JURISDICTION AND VENUE**

6    22.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §

7    1331 because it is a civil action arising under the laws of the United States.

8    23.    This Court has supplemental jurisdiction pursuant to over the state law claims

9    asserted herein pursuant to 28 U.S.C. § 1367, because they are so related to Plaintiff's federal

10    claim that they form part of the same case or controversy.

11    24.    This Court also has subject-matter jurisdiction over this action pursuant to 28

12    U.S.C. § 1332(d)(2) because this is a class action subject to the Class Action Fairness Act

13    ("CAFA"), the aggregate claims of all putative class members, are in excess of $5 million,

14    exclusive of interest and costs, and there are more than 100 putative Class Members. Many

15    members of the putative Class are citizens of states different from Defendants.

16    25.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), (c), and (d),

17    because a substantial part of the events giving rise to Plaintiff's claims occurred in this District,

18    one or more Defendants reside in this District, and each Defendant has transacted business and

19    maintained continuous substantial contacts with this District.

20    26.    This Court has personal jurisdiction over each Defendant, because each

21    Defendant has transacted business throughout the United States, including in this District, and

22    each Defendant has maintained continuous substantial contacts with this District.

23

1              **ALLEGATIONS OF FACT**

2       27.     Robinhood is an online financial services company based in Menlo Park,

3   California. Its customers place securities trades through the firm's website, by using a web-based

4   application (or "app"). Robinhood permits customers to purchase and sell securities, including

5   futures contracts.

6       28.     Robinhood has experienced significant growth as a relatively new online

7   brokerage firm. In 2019, Robinhood raised $323 million in funding at a $7.6 billion valuation.

8   The firm markets itself primarily to younger investors and claims over 10 million users of its

9   trading app.

10      29.     In May 2020, Robinhood raised over $200 million in a transaction that valued

11  Robinhood at over $8 billion and included prominent investors. Robinhood makes money

12  primarily in three ways: (1) interest earned on customer's cash balances; (2) selling order

13  information to high frequency traders and being paid for order flow; and (3) margin lending.

14  Robinhood's actions today appear to only benefit Robinhood in each of these categories and

15  were implemented not for the benefit of its users, but rather, for the benefit of themselves and

16  other Wall Streeters.

17      30.     On or around January 11, 2021, to the delight of the WallStreetBets community,

18  the price of GME began to rise.

19      31.     At that time, Robinhood allowed retail investors to trade GME on the open

20  market.

21      32.     During the week of January 25, 2021, the price of GME exploded, rising several

22  hundred percent.

8

33.     On or about January 27, 2021 Robinhood, in order to slow the growth of GME and deprive their customers of the ability to use their service, abruptly, purposefully, willfully, and knowingly pulled GME from their app. As a result, retail investors could no longer buy or even search for GME on Robinhood's app.

34.     Robinhood restricted the ability of its retail investor clients, including Plaintiff, to buy additional shares of several popular stocks, including GME, while still permitting those clients to close out their positions in the affected stocks—that is to sell their stocks, most likely to the stressed hedge funds owned by, operated by, funded by, or otherwise affiliated with Defendants Citadel, Point72, and others. Even after relaxing these restrictions in subsequent days in response to a massive public outcry and threats of regulatory intervention, Robinhood still capped the maximum number of shares its retail investor clients were permitted to buy of the restricted costs, in some cases cancelling orders if attempts were made to purchase more than a single additional share.

35.     Shortly thereafter, Robinhood's Chief Executive Officer, Vladimir Tenev, took to primetime television to say the decision to restrict trading of popular stocks was made for the benefit of investors. However, knowing the volume of trades on its platforms in these securities, Robinhood knew its actions would cause the restricted stock's prices to plummet. By doing so, Robinhood was looking out for Wall Street hedge funds at the expense of the individuals who were customers of Robinhood. So egregious was Robinhood's actions that it suffered widespread backlash from its customers condemning the company, but Robinhood pressed on with its oppressive actions anyway. It is clear from statements and actions that Robinhood and its true constituency are afraid of a "populist financial revolution" and seek to crush it at all costs.

36.     Despite taking actions obviously detrimental to its retail investor clients, Robinhood knew that those clients would be unable to engage the services of one of the many competing brokers that did not restrict trading of GME and other stocks in response to the Melvin Capital short squeeze. This is because in order to do so, clients would be forced to close out their positions with Robinhood by selling their stocks at a lower price while the value was artificially depressed. Many Robinhood clients, including Plaintiff, were forced to order such sales.

37.     Moreover, when Robinhood relaxed these restrictions, GME continued to rise for several more days, depriving Plaintiff and the class of potential gains on stocks they were not able to purchase.

38.     Robinhood essentially froze the Plaintiff's and other customers' cash by holding it and restricting them from using their own cash to buy the stocks of their choice, without any advance notice. As a result, the Plaintiff and others were unable to complete stock purchase orders and they missed out on material gains. Further, Robinhood—without authorization—cancelled its customers' orders.

39.     In sum, Robinhood has arbitrarily restricted retailer investors from purchasing GME and other stocks for no legitimate reason, thereby depriving retailer investors from the benefits of Robinhood's services.

40.     Robinhood is also taking inconsistent positions. On the one hand, it claims not to have any liquidity crisis. On the other hand, it raised an emergency $1 billion cash investment in recent days. Apparently, Robinhood's only concern is its own self-interest.

41.     If Robinhood's claim that it had no liquidity concern is true, then it paternalistically unplugged its own customers from trading stocks. However, nobody authorized

1    Robinhood to supersede the will of its own customers. Further, it is quite ironic, if not outright

2    dishonest, that Robinhood's purported attempt to "protect" its customers inured to the benefit of

3    itself and its multi- billion-dollar hedge fund network. Robinhood's customers did not join the

4    platform so that billionaires, like its Chief Executive Officer Vladimir Tenev, could look out for

5    their best interests while simultaneously betting against them. Plainly, Robinhood was either

6    malicious, grossly negligent, or a combination. Vladimir Tenev is clearly in over his head. His

7    business model either cannot (perhaps due to excessive leverage and illiquidity) or chose not to

8    keep up with customer demand. Either way, Robinhood took on contractual obligations that it

9    was not in a position to perform. This contrasts with countless other broker/dealer platforms that

10   had little or no issue fulfilling stock trades that, for Robinhood customers, were restricted.

11        42.    At no time was Robinhood permitted to restrict customers' access to stock trades

12   where such restrictions created a conflict of interest, this is especially so under circumstances

13   where Robinhood's own CEO claimed there was no emergency liquidity need.

14        43.    Not surprisingly, this is not the first time Robinhood has encountered problems

15   with their questionable business ethics and practices. The Financial Industry Regulatory

16   Authority ("FINRA") fined Robinhood $1.25 million in December 2019 for failing to ensure

17   their customers got the best prices in their trades which they funneled to companies who paid

18   them. Robinhood did so without regard to the prices they received for their clients.

19        44.    Nevertheless, by intensely marketing themselves as Main Street's ally, Robinhood

20   has been able to continue signing up customers despite its checkered past, and is still doing so.

21        45.    As it turns out, Robinhood's "commission-free" trading service is not really free.

22   Robinhood resells orders for backdoor fees that are not made clear to customers. The Securities

23   and Exchange Commission ("SEC") investigated Robinhood for failing to disclose their practice

1    of selling client orders to high frequency traders and in December 2020, Robinhood settled the

2    lawsuit by paying an enormous fine of $65 million. The SEC determined that not getting the best

3    prices cost Robinhood users over $34 million, which far exceeded any savings in "free"

4    commissions. Such a scandal would have made front page news had it affected the Wall Street

5    establishment, but apparently Robinhood and co-Defendants know the system is designed to

6    cater to the needs of the "1 percenter" at the expense of the 99 percent. Rather than representing

7    new investors and "democratizing finance," Robinhood instead picked their pockets in the

8    shadows.

9            46.     Defendants Citadel and Point72 are no strangers to scandal. In 2017, the SEC

10   fined Citadel $22 million because its algorithms took advantage of the retail investors whose

11   order flows it was purchasing. Citadel's accomplice, "Point72," is just a rebrand of S.A.C.

12   Capital ("SAC"), which was disbanded in 2014 after the firm pleaded guilty to federal insider

13   trading charges and paid a $1.8 billion fine. Among the persons named in a smattering of SAC

14   emails containing insider trading-related information was Melvin Capital's founder, a former

15   SAC employee who managed over $1 billion for SAC. If there are "nice guys" on Wall Street,

16   they're not Citadel, Point72, or Melvin.

17           47.     Robinhood works as the shepherd leading sheep, with the lure of "free trading," to

18   the Citadel-Point72-Melvin slaughterhouse. In a bombshell exposé, Bloomberg Businessweek

19   revealed that "Robinhood Gets Almost Half Its Revenue in Controversial Bargain with High-

20   Speed Traders." https://www.bloomberg.com/news/articles/2018-10-15/robinhood-gets-almost-

21   half-its-revenue-in-controversial-bargain-with-high-speed-traders (last visited Feb 3, 2021). The

22   story went on to explain that: "Robinhood Markets Inc. has built a reputation on its origins in

23   finance counterculture and a steal-from-the-rich ethos. But the firm, which offers no-fee stock

1    trading, is making almost half its revenue from one of the most controversial practices on Wall

2    Street."

3         48.      As the publication *Vice* explained, "[p]ayment for order flow wasn't invented by

4    Robinhood;" instead, "that honor belongs to Bernie Madoff." See *Vice*, "Robinhood's Customers

5    Are Hedge Funds Like Citadel. Its Users Are the Product," at

6    https://www.vice.com/en/article/qjpnz5/robinhoods-customers-are-hedge-funds-like-citadel-its-

7    users-are-the-product (last visited Feb 3, 2021).

8         49.      Recent buying in the now-restricted securities has resulted in much publicity

9    especially around losses large Wall Street hedge funds were suffering at the hands of these small,

10    individual retail investors whom Robinhood specifically targeted. By cutting off the ability of

11    Robinhood users to profit at the expense of the typical Wall Street monied interests, Robinhood

12    ensured good standing with the entrenched financial community which they really serve. Since

13    Robinhood users could only sell stocks, now large funds and entrenched financial institutions

14    could benefit by "shorting" the restricted securities knowing that the stocks would most likely go

15    down since the flow of buyers was now being intentionally choked. Upon information and belief,

16    Robinhood may have "tipped off" Wall Street funds so they could reload their short positions

17    and benefit from the ensuing collapse of stock prices when buyers are eliminated. Indeed,

18    Robinhood's profit model is specifically designed to profit off of giving these financial

19    institutions advance notice of transactions, thus allowing those institutions to place bets against

20    Robinhood's own clients.

21         50.      Ominous figures looming over this scandal include Defendants Citadel, Point72,

22    and Melvin.

51.     Citadel is one of the shrewdest and most sophisticated financial institutions on the planet, and controls over $35 billion worth of assets.

52.     When individual retail investors invested in GameStop, natural market forces caused Melvin to lose its bet that GameStop's stock price would go down. Melvin lost billions of dollars.

53.     While many saw blood in the water, Citadel and Point72 saw an opportunity that they were well suited to exploit. If they could interfere with Robinhood customers' ability to buy stocks of GameStop and other wrongfully restricted stocks, then Melvin would be stabilized, and its bets could become lucrative. As it turns out, Citadel and Point72 were in a position to stop Melvin's downfall.

54.     The special trust between Melvin, on the one hand, and Citadel and Point72 on the other, explains why Citadel and Point72 were happy to provide a multi-billion dollar "emergency influx of cash" on short notice to rescue Melvin. The founders of each firm are, as the saying goes, thick as thieves. Melvin founder Gabriel Plotkin used to work for Citadel. After Plotkin worked for Citadel, he went on to work for S.A.C. Capital. During Plotkin's time at S.A.C., "his name surfaced in emails in the insider trading trial of Michael Steinberg, one of eight people who once worked for SAC to either be convicted or plead guilty to insider trading charges," according to the *New York Times*, although Plotkin was not charged with a crime. Defendants' history of conspiratorial malfeasance is clear.

55.     Citadel and Point72 knew that their investment in Melvin was secure because they all knew that Citadel had immense influence over Robinhood. In a disclosure to the SEC, Robinhood disclosed that Citadel and a handful of other firms paid Robinhood nearly $100 million in the first quarter of 2020 alone. See RHS SEC Rule 606A and 607 Disclosure Report

1   Q1 2020. A June 2020 Fortune magazine article explained that "[t]hese payments are the

2   company's primary revenue stream—far outstripping what it earns from its premium service,

3   Robinhood Gold, or from the interest it makes on cash balances in customer accounts." Fortune

4   Magazine, "Robinhood makes millions selling your stock trades...is that so wrong?," at

5   https://fortune.com/2020/07/08/robinhood-makes-millions-selling-your-stock-trades-is-that-so-

6   wrong/ (last visited Feb. 3, 2021). Citadel is Robinhood's lifeblood. It strains credulity to believe

7   that it is a mere coincidence that the primary beneficiary of Robinhood's sacrifice of retail

8   investors were Citadel, Point72, and Melvin.

9         56.     FINRA, which governs brokers like Robinhood, espouses rule 5310 regarding

10   "Best Execution and Interpositioning." Rule 5310.01 requires that Robinhood "must make every

11   effort to execute a marketable customer order that it receives promptly and fully." By failing to

12   respond at all to customers' placing timely trades—and outright blocking customers from trading

13   a security—Robinhood has breached these, among other, obligations and caused its customers

14   substantial losses due solely to its own gross negligence and failure to maintain adequate

15   infrastructure.

16         57.     Robinhood's contractual obligations to its clients incorporates the above-

17   described obligation.

18         58.     On information and belief, Robinhood is restricting securities such as GME from

19   its platform, breaching its duties to its retail investor clients, in order to slow growth and help

20   benefit individuals and institutions who are not Robinhood customers but are Robinhood large

21   institutional investors or potential investors.

22

23

**CLASS ACTION ALLEGATIONS**

59.    Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. The proposed class is defined as "all persons who maintained an account with Robinhood, and who owned any stock the ability of which to buy or otherwise trade was restricted by Robinhood in any way not required by law, during or after the week of January 25, 2021."

60.    *Numerosity*. The members of the proposed class are so numerous that joinder of all of their claims is impracticable. The class contains thousands of individual retail investors spread throughout the United States, and at the time of filing encompasses owners of more than 50 different stocks illegally restricted by Robinhood.

61.    *Commonality and Predominance*. Common questions of fact and law predominate over questions affecting individual class members. Questions of law and fact common to class members include whether Robinhood breached fiduciary duties, duties of care and other duties, to class members, whether Citadel and Point72 conspired to aid in those breaches, and whether Robinhood, Citadel, Point72, and others conspired to restrain trade in the retail securities market in contravention of federal antitrust law.

62.    *Typicality.* The claims of the named Plaintiff are typical of the claims of the proposed Class in that the named Plaintiff was a Robinhood client during the relevant period and was unable to trade certain stocks and place time-sensitive trades on those stocks, and sustained damages as a result of Robinhood's wrongful conduct.

63.    *Adequacy.* Plaintiff will fairly and adequately represent the interests of the Class in that he has no conflicts with any other Class members. Plaintiff has retained competent

1    counsel experienced in prosecuting complex class actions, and they will vigorously litigate this

2    class action.

3         64.    *Superiority.* A class action is superior to other available methods for the fair and

4    efficient adjudication of this controversy because it will avoid the heavy burden of multiple,

5    duplicative suits, avoid the virtually impossible task of getting all class members to intervene as

6    party-plaintiffs in this action, allow the Court, upon adjudication of Defendants' liability, to

7    determine the claims of all class members, and allow the Court to enter appropriate final

8    monetary relief with respect to the class as a whole.

9         65.    *Injunctive and Declaratory Relief.* Defendants have acted or refused to act on

10   grounds that apply generally to the Rule 23(b)(2) class as a whole, so that final injunctive or

11   declaratory relief is appropriate respecting the class as a whole.

12                              **COUNT I:**

13                  **Breach of Contract (Against Robinhood)**

14        66.    Plaintiff realleges the forgoing paragraphs as if fully stated herein.

15        67.    Robinhood's relationship with its retail investor clients, including Plaintiff, is

16   governed by a Consumer Agreement to which the parties agree upon a client's sign-up for

17   Robinhood's services. This agreement is an adhesion contract.

18        68.    Robinhood breached its Customer Agreement by, among other things, failing to

19   disclose that its platform was going to arbitrarily restrict trading privileges for certain securities

20   from its platform without necessity and/or when it had a conflict of interest; that Robinhood

21   failed to provide adequate explanation to their customers; that Robinhood knowingly put their

22   customers at a disadvantage compared to customers who used other trading apps; that Robinhood

23   failed to disclose its own financial incentives to arbitrarily limit its clients' ability to trade certain

1  securities; that Robinhood prohibited Plaintiff and Class Members from performing in a timely

2  manner (or at all) under the contract; that Robinhood failed to comply with all applicable legal,

3  regulatory, and licensing requirements; that Robinhood failed to exercise trades and actions

4  requested by customers; and that Robinhood set arbitrary and capricious limits on the amount of

5  Restricted Basket stocks that could be traded. Additionally, Robinhood did not give notice that

6  any restraints would be made on purchases only but not on sales, which distorted transaction

7  volumes and manipulated the market.

8       69.     Robinhood's failure to perform and its breaches of the Customer Agreement

9  resulted in damages and losses to Plaintiff and the Class and continues to expose them to harm

10  because Robinhood continues to fail to perform under the Customer Agreement.

11                          **COUNT II:**

12              **Breach of Fiduciary Duty (Against Robinhood)**

13      70.     Plaintiff realleges the forgoing paragraphs as if fully stated herein.

14      71.     As a licensed provider of financial services, Robinhood at all times relevant

15  herein was a fiduciary to Plaintiff and Class members and owed them the highest good faith and

16  integrity in performing its financial services on their behalf. Robinhood also acted as a fiduciary

17  to each and every customer who agreed to the Customer Agreement

18      72.     In addition to acting as a provider of financial services, Robinhood also advised

19  clients, by offering stock recommendations, trading tips, and otherwise displaying paternalism

20  towards its investor clients.

21      73.     Furthermore, Robinhood made a point of intentionally marketing its services

22  specifically to unsophisticated and novice investors, and individuals inexperienced with the

23  contours of complicated trades.

74.     Robinhood breached its fiduciary duties to Plaintiff and Class members by, among other things, failing to disclose in a timely manner that its platform was going to restrict Plaintiff's and Class Members' abilities to purchases of GME, AMC, AAL, BB, NOK, and other stocks; actually restricting those abilities; restricting those abilities for its own pecuniary benefits; that Robinhood failed to provide access to its financial services in a timely manner; that Robinhood failed to comply with all applicable legal, regulatory, and licensing requirements; and that Robinhood failed to exercise trades and actions requested by customers in a complete and timely manner (also required by FINRA Rule 5310).

75.     Robinhood failed to disclose its conflict of interest when it permitted users only to sell and not buy certain stocks in a manner that inured to the benefits of itself and third parties.

76.     Robinhood's conduct has caused harm, losses, and damages, to Plaintiff and the Class, and continues to expose them to harm because Robinhood continues to breach its fiduciary duties.

## COUNT III:

### Aiding and Abetting Breach of Fiduciary Duty (Against Citadel and Point72)

77.     Plaintiff realleges the forgoing paragraphs as if fully stated herein.

78.     Robinhood breached its fiduciary duties to Plaintiff and the Class on a continuous and ongoing basis by engaging in the trading restriction scheme described above.

79.     On information and belief, Robinhood engaged in this trading restriction scheme at the direction of, and for the benefit of, Defendants Citadel and Point72, as backers of Melvin.

80.     But for the influence of Citadel and Point72 on Robinhood, Robinhood would not have engaged in the trading restriction scheme that breached its duties towards Plaintiff and the Class.

81.     The conduct of Citadel and Point72 has caused harm, losses, and damages, to Plaintiff and the Class, and continues to expose them to harm because Robinhood continues to breach its fiduciary duties.

**COUNT IV:**

**Tortious Interference with Business Relationship and Contract**
**(Against Citadel and Point72)**

82.     Plaintiff realleges the forgoing paragraphs as if fully stated herein.

83.     Plaintiff and Class Members have a business relationship with the Robinhood pursuant to which Robinhood agreed to take Plaintiff and Class Members' money because Robinhood promised to execute stock trades.

84.     Citadel and Point72 had knowledge of the above-referenced business relationship.

85.     Citadel and Point72 intentionally and unjustifiably interfered with Plaintiff's and Class Members' business relationship with Robinhood by directing or otherwise causing Robinhood to suspend the Plaintiff's and Class Members' ability to buy GME, AMC, AAL, BB, NOK, and other stocks during and after the week of January 25, 2021.

86.     As a result of Citadel and Point72's intentional and unjustified interference, Robinhood breached their business relationship with Plaintiff and Class Members, causing them to suffer damages.

**COUNT V:**

**Negligence (Against Robinhood)**

87.     Plaintiff realleges the forgoing paragraphs as if fully stated herein.

88.     Robinhood had a duty to exercise reasonable care in conducting and facilitating transactions for its customers.

89.   Robinhood had a duty to exercise reasonable care in providing trades on the free, open market for its customers.

90.   Robinhood unlawfully breached its duties by, among other things, (i) removing certain stocks without notice from its trading app; (ii) failing to provide financial services related to the certain stocks; (iii) failing to notify customers in a timely manner of the restrictions placed on certain stocks during the week of January 25, 2021 and thereafter; (iv) failing to provide a platform that could handle the transactions that it claimed it could handle; and (v) failing to carry out certain duly ordered transactions without notice.

91.   In the alternative, Robinhood unlawfully breached its duties by failing to obtain and maintain adequate capitalization for the purposes of executing orders in an environment of reasonably foreseeable increased volatility without interruption of services.

92.   Robinhood's conduct as set forth in this Complaint was want of even scant care, and its acts and omissions were and continue to be an extreme departure from the ordinary standard of conduct. Their actions breach any duty of care to their customers, but are also inconsistent with the standard of care expected from similar firms in the open market.

93.   Robinhood breached its obligations to its customers altogether by restricting the relevant stocks, conduct so far below the standard of care required of a business engaging in time sensitive trading services that it amounts to a complete abandonment of its duties.

94.   Robinhood's grossly negligent and wrongful breaches of its duties owed to Plaintiff and Class Members proximately caused losses and damages that would not have occurred but for Robinhood's gross breach of its duty of due care.

**COUNT VI:**

**Violation of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code § 17200 et seq. (Against Robinhood)**

95.     Plaintiff realleges the forgoing paragraphs as if fully stated herein.

96.     California's Unfair Competition Law ("UCL") is designed to protect consumers from unlawful, fraudulent, and/or unfair business practices. Robinhood's restrictions on the trade of securities within its app constitutes an unlawful business practice.

97.     A practice is "unlawful" if it violates a law other than the UCL. Robinhood violated Plaintiff and the Class's common law and statutory rights when it failed to provide complete trading services as to Restricted Basket stocks. Robinhood's negligence, breach of contract, and breach of fiduciary duty made Plaintiff and the Class unable to trade the Restricted Basket stocks and lose out on massive potential gains.

98.     These violations of common and state law act as the predicate violations under the unlawful prong of the UCL, as Robinhood created private causes of action against it by damaging the property rights of Plaintiff and the Class via its unlawful conduct.

99.     A practice is "fraudulent" if members of the general public were or are likely to be deceived. Robinhood's messaging that it was an open platform and its mission to "democratize" trading is likely to deceive users into believing that they are truly open to purchase how they please on Robinhood's marketplace, when in fact Robinhood will arbitrarily restrict what stocks its users can purchase.

100.    The UCL gives courts maximum discretion to address improper business practices that are "unfair." Robinhood's business practices have become, and will continue to be, unfair because Robinhood users were assured that they would be able to trade freely on the Robinhood service and not have what stocks they were able to trade in be arbitrarily restricted at the

potentially nebulous whims of Robinhood. The gravity of the harm caused to Robinhood users, such as Plaintiff, far outweighs any business reason, justification, or motive Robinhood may have had for engaging in its unfair business practices.

101.    As a result of Robinhood's unlawful, fraudulent, and/or unfair business practices, Plaintiff and Class Members suffered injury in fact and have lost a property interest in the values of their stock portfolios given their inability to effectively purchase new stock on the Robinhood platform.

102.    Accordingly, Plaintiffs and the other Class members have suffered injury in fact including lost money or property as a result of Robinhood's misconduct.

103.    Plaintiff and the Class seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices. Plaintiff and the Class requests that this Court enter such orders or judgments as may be necessary to enjoin Robinhood from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

## COUNT VII:

**California Consumers Legal Remedies Act, Cal. Civ. § 1750 et seq. (Against Robinhood)**

104.    Plaintiff realleges the forgoing paragraphs as if fully stated herein.

105.    Plaintiff and Class Members, as individual retail investor clients of Robinhood, purchased brokerage services from Robinhood for personal, family, or household purposes.

106.    By making and then failing to honor the promises contained in the Consumer Agreement, promises contained in Robinhood's marketing statements representing it as a broker serving the interests of Main Street retail investors as explicitly opposed to large, institutional

1   investors like Citadel, Point72, and Melvin, and promises to provide access to Main Street retail

2   investors to those same investment tools available to large, institutional investors like Citadel,

3   Point72, and Melvin, Robinhood: (a) represented that its services had characteristics, uses, and

4   benefits that they did not have; (b) represented that its services were of a particular standard and

5   quality when they were not, (c) advertised services with the intent not to provide them as

6   advertised, and (d) advertised services with the intent not to supply reasonable expected demand

7   by failing to capitalize for reasonably foreseeable volatility.

8       107.    By failing to disclose to its clients the material nature of its relationship with

9   Citadel and Point72, Robinhood misrepresented its affiliation, connection, or association with

10  another.

11      108.    Each of the above-referenced misrepresentations was a material

12  misrepresentation.

13      109.    Plaintiff actually relied upon the above-referenced misrepresentations, and would

14  not have purchased Robinhood's services had he been aware of any of those misrepresentations.

15      110.    In accordance with Civil Code section 1780, Plaintiff and Class members seek

16  injunctive and equitable relief for Robinhood's violations of the CLRA necessary to bring it into

17  compliance with the CLRA by, among other things, disclosing the true nature of its services and

18  that Robinhood is unable to fulfill reasonable consumer demand—including trading securities

19  available on every other major trading platform—correcting its services so that its platform can

20  perform as necessary to comply with its legal, regulatory and contractual obligations, and

21  making customers whole for their losses.

22      111.    Plaintiff intends to amend this complaint to add a claim for damages under the

23  CRLA (including punitive damages for the malicious, oppressive and fraudulent acts against

1    Plaintiff as plead above) if an adequate correct offer—as to the damages to Plaintiff and the

2    Class described in this complaint—is not made by Defendant within 30 days of service of this

3    complaint on Defendant.

4                                          **COUNT VIII:**

5        **Breach of Covenant of Good Faith and Fair Dealing (Against Robinhood)**

6        112.    Plaintiff realleges the forgoing paragraphs as if fully stated herein.

7        113.    Plaintiff and Class Members entered into the Customer Agreement with

8    Defendant Robinhood to open a Robinhood trading account. They agreed to Robinhood's Terms

9    and Conditions by using Robinhood's website and trading platform.

10       114.    Plaintiff and Class Members fulfilled their obligations under these contracts by

11   adhering to their terms and using Robinhood's trading services through its website and trading

12   platform

13       115.    Robinhood was obligated to provide the trading services required under those

14   contracts at all times, including but not limited to, trades for stocks restricted during and after the

15   week of January 25, 2021.

16       116.    When initially signing up for Robinhood, Plaintiff and Class Members could and

17   most actually did trade the stocks that were subsequently restricted during and after the week of

18   January 25, 2021.

19       117.    Robinhood unfairly interfered with the rights of Plaintiff and Class Members to

20   receive the benefits of the Customer Agreement by, among other things, (i) failing to provide

21   services necessary to carry out a trade; (ii) failing to provide certain trading services whatsoever;

22   (iii) failing to inform individuals in a timely member of the drastic changes in trading abilities;

23   and (iv) prohibiting Plaintiff and Class Members from buying the restricted stocks for

1   Robinhood's own pecuniary interest and not disclosing those interests to Plaintiff and Class

2   Members.

3       118.    Robinhood's conduct has caused Plaintiff and Class Members harm, losses, and

4   damages.

5                                        **COUNT VIII:**

6       **Agreement in Restraint of Trade, 15 U.S.C. § 1 (Against All Defendants)**

7       119.    Plaintiff realleges the forgoing paragraphs as if fully stated herein.

8       120.    On information and belief, Defendants conspired and entered into an

9   anticompetitive scheme to fix, raise, stabilize, maintain, or suppress the price of a number of

10  stocks, including but not limited to GME, AMC, AAL, BB and NOK.

11      121.    Faced with potentially disastrous losses due to Melvin's short position, Citadel

12  and Point72, rather than engage in competition, conspired, combined, agreed, and colluded with

13  Robinhood to restrict purchases in stocks by Class Members and to manipulate and artificially

14  suppress the price of stock, though which they could cover their short position.

15      122.    Defendants conspired and agreed with one another with the intent to artificially

16  lower the price of the relevant stocks.

17      123.    Defendants coordinated a shutdown of a significant portion of the stock brokerage

18  market with respect to the relevant stocks, prohibiting market participants with the exception of

19  large, institutional investors including Citadel and Point72 from purchasing shares of the relevant

20  stocks. Pursuant to the conspiracy, the restriction of stock purchases resulted in a sell-off of

21  stocks, driving down prices of the relevant stocks to levels that would not have been obtained,

22  but for the conspiracy, combination, agreement in restraint of trade.

124.     In furtherance of the conspiracy, combination, agreement in restraint of trade, on January 27, 2021, after the close of the stock market and before the open of the market the next day, Citadel, Point72, and/or Melvin, and others, coordinated and planned to increase short volumes in anticipation of short calls on January 28, 2021.

125.     In furtherance of the conspiracy, combination, agreement in restraint of trade, Robinhood has prohibited, and continues to prohibit or unreasonably restrict, the purchases of shares of the relevant stocks by Plaintiff and Class Members in restraint of trade.

126.     As a direct result of Defendants' contract, combination, conspiracy, and agreement in restraint of trade, Defendants caused injury to Plaintiff and Class Members by restricting purchases of GME, AMC, AAL, BB, NOK, and other stocks. Robinhood deactivated the buy option and left Plaintiff and Class Members no alternative but to sell shares of the stocks on their platforms. Plaintiff and Class Members, faced with an imminent decrease in the price of their positions in the relevant stocks due to the inability of retail investors to purchase shares, were induced to sell their shares in the relevant stocks at a lower price than they otherwise would have, but for the contract, combination, conspiracy, and agreement in restraint of trade. Additionally, Plaintiff and Class Members would have purchased more of the relevant stocks given the previous upward trend in price, but could not do so.

127.     Pursuant to the contract, combination, conspiracy, and agreement in restraint of trade, Robinhood permitted Citadel, Point72, and/or Melvin, who were exposed in short positions due to the short squeeze, purchased the artificially price-suppressed stocks to cover their short positions.

128.     Defendants' anticompetitive scheme is per se illegal.

129.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class Members suffered harm in the form of financial loss.

130.    Plaintiff and Class Members further seek injunctive relief pursuant to Section 16 of the Clayton Act, 16 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

WHEREFORE Plaintiff requests that the Court enter judgment on behalf of himself and the Class as defined herein, and issue an order:

(A) Directing that this action may proceed as a class action and appointing Plaintiff as Class Representative, and Plaintiff's counsel as Class Counsel;

(B) Enjoining Robinhood from continuing to restrict trading by Plaintiff and Class Members of any of the relevant stocks, including but not limited to GME, AMC, AAL, BB, and NOK, in any manner not prescribed by law.

(C) Awarding actual damages, trebled pursuant to 15 U.S.C. § 15(a);

(D) Awarding punitive damages;

(E) Awarding Plaintiff and Class Members their reasonable attorneys' fees and costs; and,

(F) Awarding any other relief this Court determines to be appropriate and just.

1

**JURY TRIAL DEMANDED**

2

　　　Pursuant to Fed. R. Civ. P 38(b), Plaintiff demands a trial by jury of all claims that may

3

be so tried.

4

Dated: 02/08/21　　　　　　　　　　BY:　/s Charles D. Marshall

5

　　　　　　　　　　　　　　　　　　　Charles D. Marshall (SBN. 236444)

6

　　　　　　　　　　　　　　　　　　　**MARSHALL LAW FIRM**
　　　　　　　　　　　　　　　　　　　2121 N. California Blvd., Suite 290

7

　　　　　　　　　　　　　　　　　　　Walnut Creek, CA 94596
　　　　　　　　　　　　　　　　　　　Telephone: (925) 575-7105
　　　　　　　　　　　　　　　　　　　Facsimile: (855) 575-7105

8

9

　　　　　　　　　　　　　　　　　　　James P. Batson, Esq.
　　　　　　　　　　　　　　　　　　　(*Pro hac vice* forthcoming)

10

　　　　　　　　　　　　　　　　　　　Christopher V. Langone
　　　　　　　　　　　　　　　　　　　(*Pro hac vice* forthcoming)

11

　　　　　　　　　　　　　　　　　　　520 White Plains Rd., STE 500
　　　　　　　　　　　　　　　　　　　Tarrytown, NY10591

12

　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff Joseph Daniluk, on*
　　　　　　　　　　　　　　　　　　　*behalf of himself and all others similarly*

13

　　　　　　　　　　　　　　　　　　　*situated*

14

15

16

17

18

19

20

21

22

23